**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

FIRST NEW YORK SECURITIES L.L.C., T3
TRADING GROUP, LLC and AVATAR
SECURITIES, LLC,

          Plaintiffs,

   v.

NASDAQ OMX GROUP, INC. and THE NASDAQ
STOCK MARKET LLC,

          Defendants.

Civil Action No. 1:12-cv-05630

CLASS ACTION

DEMAND FOR JURY TRIAL

---

## AMENDED CLASS ACTION COMPLAINT
## FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

---

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................ 2

        A.      NASDAQ's Pre-Class Period Material Statements ...................... 4

        B.      NASDAQ's Costly Business Decisions ...................................... 6

        C.      NASDAQ Commences The May 18, 2012 Facebook IPO Despite Known
                Technical And Computer Related Problems ................................ 8

II.     JURISDICTION AND VENUE ..................................................... 10

III.    PARTIES ....................................................................................... 11

        A.      Plaintiffs ................................................................................ 11

        B.      Defendants ............................................................................ 12

IV.     NASDAQ'S ROLE AS A SELF-REGULATORY ORGANIZATION ...................... 13

        A.      NASDAQ's Delineated Duties As An SRO ............................ 13

        B.      NASDAQ's For-Profit Business Decisions, Material Misstatements And
                Omissions Of Material Fact Fall Outside Its SRO Functions .............. 15

V.      FACTUAL BACKGROUND ......................................................... 16

        A.      NASDAQ Undertakes An Aggressive Campaign To Solicit Facebook To List Its
                Common Stock On The NASDAQ Stock Market ................................ 16

        B.      NASDAQ's Material Statements Concerning Its Technology And Electronic
                Trading Platforms In Its 2011 Form 10-K ..................................... 21

        C.      NASDAQ Drastically Shortens The Time Period For Facebook To List Its
                Common Stock On The NASDAQ-100 Index ................................. 24

        D.      NASDAQ Changes Its IPO Procedures To Maximize Trading Volume In
                Connection With Facebook's Offering ........................................... 26

        E.      NASDAQ's Material Statements Concerning Its Technology And Electronic
                Trading Platforms In Documents Related To Its First Quarter 2012 Financial
                Results ...................................................................................... 29

        F.      NASDAQ's Material Statements Concerning Its Technology And Electronic
                Trading Platforms On Its Website ................................................. 31

        G.      NASDAQ's Materially False And Misleading Statements Concerning Its
                Technology And Electronic Trading Platforms During Its May 10, 2012 Investor
                Day Conference .......................................................................... 33

VI.     CLASS PERIOD EVENTS AND DEFENDANTS' OMISSIONS OF MATERIAL
        FACT ........................................................................................... 36

VII.    POST-CLASS PERIOD REVELATIONS ...................................... 42

VIII.   CLASS ACTION ALLEGATIONS .............................................. 47

i

IX.    CAUSE OF ACTION ............................................................................ 49

       COUNT I:  Violation Of § 10(b) Of The Exchange Act And Rule 10b-5 Promulgated
       Thereunder ......................................................................................... 49

X.     PRAYER FOR RELIEF ..................................................................... 52

Plaintiffs First New York Securities L.L.C., T3 Trading Group, LLC and Avatar Securities, LLC (collectively, the "NASDAQ Claimant Group" or "Plaintiffs"), bring this action on behalf of themselves and all other persons and entities that purchased and/or sold on the open market the common stock of Facebook Inc. ("Facebook") on May 18, 2012, the first day of trading in connection with Facebook's initial public offering (the "IPO" or the "Offering") (the "Class Period"), and who suffered monetary losses as a result of Defendants' (defined below) reckless conduct as detailed herein (the "Class" or "Class Members").  During the Class Period, Plaintiffs, in particular, traded in excess of $300 million in shares of Facebook's common stock.

Plaintiffs base the allegations set forth herein upon personal knowledge as to themselves and upon information and belief as to all other matters.  Plaintiffs' information and belief is based on, *inter alia*, the ongoing investigation of their undersigned counsel, Entwistle & Cappucci LLP.  The investigation includes, but is not limited to, a continued review of:

- Public filings with the Securities and Exchange Commission ("SEC") by Defendant NASDAQ OMX Group Inc. ("NASDAQ OMX");

- Press releases and media reports concerning NASDAQ OMX, its U.S. subsidiary, Defendant The NASDAQ Stock Market LLC ("NASDAQ LLC") (collectively, "NASDAQ" or "Defendants"), NASDAQ's CEO, Robert Greifeld ("Greifeld"), Facebook, and related parties;

- Submissions in other legal actions involving Defendants, Facebook and related parties;

- Media and economic reports regarding the facts and circumstances surrounding Facebook's IPO; and

- Correspondence with industry experts and institutional investors that utilize the NASDAQ stock market as a vital part of their respective businesses.

Counsel's investigation into the factual allegations contained herein is continuing, and Defendants uniquely possess many of the facts supporting Plaintiffs' allegations and/or such facts are exclusively within the Defendants' custody and control.  Plaintiffs believe that

1

substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    INTRODUCTION

1.    This action arises out of Defendants' materially false and misleading statements and omissions of material fact concerning the purported capabilities of NASDAQ's technology and electronic trading platforms to accurately and reliably execute trade orders.  In connection with Facebook's IPO, NASDAQ's wrongdoing caused the NASDAQ Claimant Group and other Class Members to, among other things:  (i) execute open market transactions in Facebook common shares at erroneous prices; (ii) suffer market delays in trading; (iii) receive failed executions and confirmations of trades and cancellations as well as duplicate and erroneously routed trade orders; and (iv) experience similar and related systematic failures of the NASDAQ trading platform, thereby suffering enormous financial losses.

2.    As further detailed herein, in an effort to capitalize on the largest IPO in the history of the NASDAQ stock exchange, Defendants abandoned and/or recklessly disregarded proper internal controls and testing procedures which would have otherwise ensured that its systems could handle the record-setting trading volume in connection with Facebook's IPO.

3.    As is now known, in the weeks leading up to the most anticipated IPO in NASDAQ's history, Defendants knew or recklessly disregarded that NASDAQ's technology and trading platforms were experiencing significant problems.  According to reports, NASDAQ was conducting volume testing demonstrating internally that its trading platforms were plagued by technical glitches in the days leading up to, and including, the May 18, 2012 IPO.  Despite these known problems, it is now clear that NASDAQ "opted to roll the dice" with the world's largest IPO by promoting its purported ability and superiority over other exchanges rather than admitting its systems were not up to the task.

2

4.      Indeed, on May 10, 2012 – *one week before* Facebook's IPO – NASDAQ held an Investor Day conference, during which it made a series of materially false and misleading public statements concerning its technology and trading platforms.  Among other things, NASDAQ stated that its "*business success is built from our technology excellence*"[1] and that "*[n]o trading platform on the planet is faster or more scalable.*"  NASDAQ also stated that its "*technology can help trade and clear any and every financial instrument on the planet*" as NASDAQ purportedly has "*unique capabilities unmatched by any exchange in the world.*"  Incredibly, NASDAQ made these statements when it knew and/or recklessly disregarded the fact that its software systems could not properly handle the Facebook IPO, scheduled just days after the Investor Day conference.

5.      Although Defendants knew in the weeks leading up to the IPO that NASDAQ's systems could not properly execute trading in Facebook's shares, Defendants failed to disclose any information to Class Members about these problems.  Further, as detailed below, Defendants neither updated nor corrected prior material statements regarding NASDAQ's purported superior technology and the reliability and speed of its electronic trading platforms.  Instead, Defendants chose to remain silent and/or recklessly disregarded NASDAQ's known technical and computer related problems that would ultimately cause:  (i) the opening of trading in the Facebook IPO to be delayed by approximately 30 minutes; (ii) approximately 17 seconds of "dead air" just before the opening; (iii) the bid and ask quotes to become "stuck" for over 2 hours with the result that transactions involving more than 270 million shares hit the tape almost simultaneously at 1:50 p.m.; and (iv) countless order routing errors, including failures in transaction execution, cancellations and related confirmations.  As a result of Defendants' material misrepresentations

---

[1] Unless otherwise stated herein, emphasis is added to certain quoted statements.

and omissions, Class Members were damaged in excess of what at least one source estimates to be $4 per share in connection with their trading in Facebook's IPO on the NASDAQ trading platform, in violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder.

6.     Indeed, in the weeks following Facebook's IPO debacle, NASDAQ's CEO, Greifeld, admitted that NASDAQ "*was unprepared for increasing numbers of canceled orders in the hours leading up to Facebook's debut*," and that NASDAQ's inadequate testing before Facebook's IPO "*didn't account for the increasing volume at which cancellations can come in*." Blinded by its commercial desire for enormous profits and to cement its reputation as the venue of choice for the biggest U.S. technology companies, Greifeld noted that NASDAQ's "*arrogance*" and "*overconfidence*" contributed to investors' losses in connection with Facebook's IPO. In Greifeld's own words, "*we did not have enough business judgment in the process*."

**A.    NASDAQ's Pre-Class Period Material Statements**

7.     As is now apparent, in the months leading up to Facebook's May 18, 2012 IPO, NASDAQ and the New York Stock Exchange (the "NYSE") engaged in aggressive campaigns to persuade Facebook executives to list the historic IPO on their respective exchanges and to encourage investors to participate in the IPO. NASDAQ's commercial interests in Facebook were apparent – obtaining Facebook's business meant more fees, a boost in trading revenue and the chance to link NASDAQ's brand with the historic IPO of the largest social-networking website in the world.

8.     During NASDAQ's campaign to obtain Facebook's IPO, NASDAQ made a series of statements in its Form 10-K for its fiscal year 2011, filed with the SEC on February 24, 2012 (the "2011 Form 10-K"). In it, NASDAQ stated, among other things, that it was a "leader in

4

global exchange technology" and that it *"provides technology to customers with the speed, scale and reliability required to meet the specific needs of their markets."* Moreover, NASDAQ stated that it *"ensure[s] transparent trading and a fair and orderly market for the benefit of investors"* and that its trading platform *"processes trades at sub-millisecond transaction speeds with close to 100% system reliability."*

9.     Similar to the statements NASDAQ made in its 2011 Form 10-K, NASDAQ also made material statements concerning the purported capability, speed and reliability of its technology and trading platforms in documents related to its first quarter 2012 financial results and on its website. For example, NASDAQ stated that market trends require it to make "continued investment in technology to meet customers' demands for speed, capacity, and reliability." NASDAQ also stated that its technology and trading platforms were able to "process more than 1 million messages per second at sub-40 microsecond speeds with 99.999% uptime, our technology drives more than 70 marketplaces in 50 developed and emerging countries into the future, powering 1 in 10 of the world's securities transactions."

10.     On its website, NASADQ also boasted of its commitment and "passion for flawless execution and our relentless pursuit to anticipate customer requirements" and that it *"continue[s] to set new standards in exchange trading technology."* Based upon NASDAQ's purported technological capabilities, it guaranteed market participants that it had a *"proven delivery methodology ensur[ing] delivery on-time, on-target and ready-to-launch."* As further detailed below, Defendants failed to update and/or correct these and other material statements when it became apparent that these statements were no longer accurate, complete or true as revealed by its inadequate trading volume testing for Facebook's IPO and during the Class Period, when its systems failed to properly execute trade orders in Facebook common stock.

5

**B.     NASDAQ's Costly Business Decisions**

11.     As part of a concerted effort to solicit Facebook executives to list the company's stock with NASDAQ, Greifeld and other NASDAQ executives made a variety of costly business decisions, the consequences of which were borne out on the day of Facebook's IPO.  For example, NASDAQ drastically shortened the time period that a company was required to be listed on the exchange prior to qualifying for inclusion in the coveted NASDAQ-100 Index. Instead of adhering to its longstanding rule that there needed to be a two-year waiting or "seasoning" period prior to any company being eligible for inclusion in the NASDAQ-100 Index, NASDAQ reduced the "seasoning" period to only three months as part of its efforts to attract Facebook.

12.     After it was widely reported on April 5, 2012 that Facebook chose NASDAQ as the exchange to list its common stock, news reports detailed that the prospect of inclusion into the NASDAQ-100 Index was a deciding factor for Facebook to pick NASDAQ over the NYSE, as inclusion in this Index would likely create $2 to $3 billion of "systematic demand" for Facebook stock.

13.     On April 20, 2012 – approximately one month prior to Facebook's IPO debut – NASDAQ implemented another business strategy that lured Facebook to its exchange. Specifically, NASDAQ changed its rules to allow investors to place orders for IPO securities from 7:00 a.m. EST on the first day of trading.  Previously, NASDAQ was only able to capture orders in a brief 15-minute pre-opening "bookbuilding" phase.  By implementing this new business strategy, NASDAQ significantly increased the number of trade orders in Facebook stock and, consequently, its own revenues, by maximizing trading volume on the day of the Offering.  However, NASDAQ failed to establish adequate internal controls to ensure that its systems could properly process the enormous anticipated trading volume caused by NASDAQ

changing its pre-market IPO trading procedures – despite NASDAQ's assurances that it

"provides technology to customers with the speed, scale, and reliability required to meet the

specific needs of their markets."

14.     In the months leading up to Facebook's Offering, many market participants

predicted that Facebook's IPO would be "the biggest ever to hit Wall Street," with estimates that

"day one trading in Facebook shares could see as many as 600 million of its shares change

hands," according to *The Wall Street Journal*.  Given that many people in the financial

community predicted that Facebook's IPO would set new records in trading volume, NASDAQ

purportedly undertook a series of tests on its systems in the weeks leading up to Facebook's IPO

to ascertain whether its systems could properly execute the trading volume.  However,

NASDAQ's tests were wholly inadequate.

15.     As reports issued in the weeks following the Facebook Offering indicated,

NASDAQ's tests only simulated trading volumes of approximately 6 to 53 million shares,

despite anticipated shares of approximately 600 million changing hands on the day of

Facebook's IPO.  This amount was substantially lower than the more than 80 million shares that

were traded on the NASDAQ *in the first 30 seconds of trading*, and less than 10% of the total

volume of 567 million shares that were ultimately traded the day of the Offering.  Accordingly,

NASDAQ never properly tested its electronic trading systems to ensure that it could handle the

anticipated trading volume in Facebook's Offering.  Despite these inadequate tests, Defendants

failed to update and/or correct their prior statements concerning the capability and reliability of

NASDAQ's technology and trading platforms.

16.     Moreover, news reports have indicated that while NASDAQ's testing failed to

account for the anticipated trading volume in connection with Facebook's IPO, it did reveal that

7

NASDAQ's electronic systems were experiencing significant technical problems and related computer issues that NASDAQ was unable to fix prior to the Offering. Despite these known problems, NASDAQ "rolled the dice" and pushed Facebook's IPO forward on May 18, 2012.

    **C.**    **NASDAQ Commences The May 18, 2012 Facebook IPO Despite Known Technical And Computer Related Problems**

    17.    On May 18, 2012, despite NASDAQ's assurances that it maintained "the fastest trading platform in the world" which allowed for "flawless execution," Defendants completely mishandled Facebook's IPO and the processing of trades on the open market that day through their reckless conduct as further detailed herein. While NASDAQ executives were busy implementing creative business strategies to cash in on NASDAQ's lottery-winning Facebook ticket, Defendants failed to disclose any of the known technical problems prior to and during the Class Period. Defendants also failed to correct and/or update statements concerning NASDAQ's technology and ability to properly execute trades as NASDAQ's technical and computer related problems severely disrupted open market trading on the day of the Offering.

    18.    Consequently, NASDAQ permitted false bid and ask quotes to be disseminated to the market and failed to process Facebook trades promptly, accurately or efficiently, leading investors to purchase or sell Facebook shares at incorrect prices. Investors who attempted to purchase Facebook shares never received timely confirmations from NASDAQ that they had actually done so. In fact, NASDAQ failed to confirm some trade orders for hours on end, and failed to cancel other orders despite customer requests to do so.

    19.    Initially, due to NASDAQ's technical problems in establishing an opening price with its IPO Cross system, Defendants delayed the opening of trading in Facebook stock for nearly thirty minutes. Moreover, traders were experiencing problems entering or changing quotations in the hours before NASDAQ opened trading. According to post-Class Period

8

reports, NASDAQ was still attempting to work through orders and cancellations just moments prior to the opening. Although it was clear at that point that NASDAQ's systems would not be able to handle the enormous trading volume expected in Facebook's IPO, Defendants nevertheless decided to officially open trading in Facebook stock at 11:30 a.m. EST on May 18, 2012.

20.     After Facebook trading began, matters became much worse. The massive amount of trading in Facebook stock overwhelmed NASDAQ's trading platform causing a backlog of unfilled orders. Confirmation orders from NASDAQ, which normally arrive in milliseconds, were significantly delayed, if they ever arrived at all. Investors and brokers could not tell whether their orders went through and if they did, at what price. Hours passed before NASDAQ finally processed some trade orders, leaving investors unable to figure if and when they should sell their stock. In addition, NASDAQ was so overwhelmed that it failed to cancel numerous orders and failed to process sale orders despite timely customer requests to do so.

21.     Incredibly, Defendants failed to disclose to Class Members or the general market any of these known problems during the Class Period despite having a duty to do so. Due to Defendants' recklessness, Plaintiffs and other Class Members were substantially damaged. For example, Class Members who submitted buy orders at a certain price and quantity ended up getting Facebook stock at a completely different price than was submitted in their purchase orders. As is now known, the offer and bid quotes on NASDAQ's systems were completely wrong – these "phantom quotes" left Class Members, including the named Plaintiffs herein, without any information as to how much Facebook stock they purchased or at what price. Other Class Members never received notice that their orders were in fact executed, creating confusion

among certain Class Members who placed duplicate buy or sell orders that also were not

properly executed, compounding the problem.

22.    Given the substantial damages caused by NASDAQ's misconduct, both the SEC

and the U.S. Senate are presently conducting investigations into NASDAQ's role in mishandling

Facebook's IPO, including inquiries into what NASDAQ personnel knew about the technical

problems prior to commencing trading in Facebook's stock.

23.    On July 21, 2012, weeks after NASDAQ had admitted its fault for the botched

Facebook IPO, *The Wall Street Journal* reported that NASDAQ will set aside $62 million "to

contain the reputational damage from the Facebook snafu." The article quoted Greifeld, who,

again, admitted that "[w]e failed to meet our own high standards. . . . We have learned from this

experience and we will continue to improve our trading platforms." The article also noted that

NASDAQ "hired International Business Machines Corp. (IBM) to review its trading systems and

said Friday the process is continuing."

24.    By this action, Plaintiffs seek recovery for themselves and other Class Members

who suffered damages as a result of Defendants' violations of the federal securities laws.

## II.    JURISDICTION AND VENUE

25.    This action arises under Sections 10(b) of the Exchange Act, 15 U.S.C. § 78j(b),

and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

26.    This Court has jurisdiction over the subject matter of this action pursuant to

Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1331.

27.    Venue is proper in this District pursuant to the provisions of Section 27 of the

Exchange Act, 15 U.S.C. § 78aa. During the Class Period, Defendants' principal place of

business was located at One Liberty Plaza, New York, New York 10006, and Defendants

EC.49438.1

transact substantial and ongoing business within the District.  Additionally, many of the acts and transactions giving rise to the violations of law complained of herein, including the preparation and dissemination to the investing public of false and misleading information and material omissions through the means and instrumentalities of interstate commerce, occurred in this District.

## III.   PARTIES

### A.   Plaintiffs

28.   Plaintiff First New York Securities L.L.C. ("First New York") is a professional proprietary trading firm that relies on the proper functioning of NASDAQ's technology and electronic trading platforms as a vital part of its business.   First New York purchased Facebook common stock, as set forth in the certification attached hereto and incorporated herein by reference, on the open market, and was damaged thereby.

29.   Plaintiff T3 Trading Group, LLC ("T3 Trading") is a professional proprietary trading firm that relies on the proper functioning of NASDAQ's technology and electronic trading platforms as a vital part of its business.  T3 Trading purchased Facebook common stock, as set forth in the certification attached hereto and incorporated herein by reference, on the open market, and was damaged thereby.

30.   Plaintiff Avatar Securities, LLC ("Avatar") is a professional proprietary trading firm that relies on the proper functioning of NASDAQ's technology and electronic trading platforms as a vital part of its business.  Avatar purchased Facebook common stock, as set forth in the certification attached hereto and incorporated herein by reference, on the open market, and was damaged thereby.

11

**B.    Defendants**

31.    Defendant The NASDAQ OMX Group, Inc. is a Delaware corporation with its principal place of business at One Liberty Plaza, New York, New York 10006.  NASDAQ OMX, together with NASDAQ LLC, operates the NASDAQ Stock Market.  NASDAQ OMX delivers trading, clearing, exchange technology, regulatory, securities listing, and public company services worldwide.  It offers trading across various asset classes, including cash equities, derivatives, debt, commodities, structured products, and exchange traded funds, market data products, financial indexes, capital formation solutions, financial services, and market technology products and services, as well as clearing, settlement, and depository services.  NASDAQ OMX also provides trade reporting, trade comparison, and risk management services as well as broker services comprising technology and customized securities administration solutions to financial participants.  In addition, it offers global listing services, technology solutions for trading, clearing, settlement, and information dissemination, and facility management integration, surveillance solutions, and advisory services, as well as develops and licenses NASDAQ OMX branded indexes, associated derivatives, and financial products.  As of December 31, 2011, approximately 3,500 securities were listed on the NASDAQ.  The company offers approximately 2,600 indexes.  NASDAQ OMX also offers technology solutions to approximately fifty countries.  NASDAQ OMX was formerly known as The Nasdaq Stock Market, Inc. and changed its name in February 2008.

32.    Defendant The NASDAQ Stock Market LLC is a Delaware limited liability company with its principal place of business at One Liberty Plaza, New York, New York 10006.  NASDAQ LLC is the principal U.S. subsidiary of NASDAQ OMX.  NASDAQ LLC, together with NASDAQ OMX, operates the NASDAQ Stock Market.

EC.49438.1

## IV.   NASDAQ'S ROLE AS A SELF-REGULATORY ORGANIZATION

33.     In 1971, the National Association of Securities Dealers ("NASD") formed the first electronic stock market.  This market was called the NASDAQ or the "National Association of Securities Dealers Automated Quotations."  Over the next several decades, NASDAQ added more automated trading systems and reporting services, growing in size and complexity.  In 1994, NASDAQ surpassed the NYSE in yearly share volume and in 1999 it became the world's largest stock market by dollar volume.

34.     In 2000, NASD spun off NASDAQ, creating a publicly traded company, the NASDAQ Stock Market, Inc.  In 2007, the NASDAQ Stock Market, Inc. acquired OMX, which then controlled several European stock exchanges.  The new company that was created is Defendant NASDAQ OMX.  Defendant NASDAQ OMX is now the world's largest exchange company, and Defendant NASDAQ LLC is its primary United States subsidiary.

### A.     NASDAQ's Delineated Duties As An SRO

35.     Under the Exchange Act, Congress established a system of regulation over the securities industry which relies on self-regulatory organizations ("SRO") to conduct the day-to-day regulation and administration of the United States' stock markets under the close supervision of the SEC.

36.     On November 21, 1997, the SEC authorized NASD to delegate its SRO functions to NASDAQ for operating and maintaining the NASDAQ stock market.  Thus, NASDAQ is classified as an SRO within the meaning of the Exchange Act, 15 U.S.C. § 78c(a)(26), which vests it with a variety of adjudicatory, regulatory, and prosecutorial functions, including implementing and effectuating compliance with securities laws as well as promulgating and enforcing rules governing the conduct of its members.  In effect, NASDAQ specifically oversees and ensures proper regulation of its stock market on behalf of the SEC.

13

37. In this regard, NASDAQ's SRO responsibilities include, among other things, formulating regulatory policies for the NASDAQ stock market and enforcing those policies and rules, subject to the approval of the NASD and ultimately the SEC. NASDAQ also has statutorily delegated responsibilities to prevent fraudulent and manipulative practices, to promote just and equitable principles of trade, and to protect investors and the public interest.

38. While NASDAQ operates in an SRO capacity as described above, it is, at the same time, a for-profit corporation. Accordingly, NASDAQ engages in a variety of non-governmental activities that serve its commercial business interests, such as its efforts to increase trading volume and trade execution, attract new IPOs, and improve its market share over competing stock exchanges. Indeed, even though the SEC has delegated regulatory functions to SROs like NASDAQ, the SEC has noted that SROs maintain a dual status as both quasi-regulators and for-profit businesses. As a result, the SEC has warned that "[t]his business pressure can create a strong conflict between the SRO regulatory and market operation functions." *See* Concept Release Concerning Self Regulation, Release No. 34-50700, (Nov. 18, 2004).

39. As detailed below, NASDAQ's alleged wrongdoing, including its material misstatements and omissions of material fact concerning the known technical and computer related problems during the Class Period, as well as NASDAQ's failure to update and/or correct its pre-Class Period statements that touted its technology and trading platform capabilities to reliably and efficiently execute trades, was in its capacity as a for-profit business. Accordingly, NASDAQ's wrongdoing falls outside the scope of its delegated SRO functions.

14

EC.49438.1

**B.     NASDAQ's For-Profit Business Decisions, Material Misstatements And Omissions Of Material Fact Fall Outside Its SRO Functions**

40.     NASDAQ's decision to push the IPO forward (despite the known technical problems) was outside any delegated quasi-governmental prosecutorial, regulatory, or disciplinary function.  Instead NASDAQ's alleged wrongdoing was a purely business activity the purpose of which was to maximize trading volume and company profits, while enhancing its reputation as the "go to" exchange for the largest U.S. technology companies.

41.     In choosing to make the materially false and misleading statements and omissions of material fact concerning its technology and trading platforms as detailed herein, NASDAQ was representing no one but itself by advertising and promoting its technology and electronic marketplace to increase trading on its exchange.  By falsely assuring investors, including Class Members, that the capabilities, speed and reliability of NASDAQ's technology and trading platforms were second to none, NASDAQ sought to increase trading volume and related transactions on its exchange, thereby directly increasing its revenue.  NASDAQ's wrongful conduct as alleged herein was purely commercial activity and falls outside its SRO functions.

42.     Indeed, Plaintiffs make no claim based upon any failure of NASDAQ to fulfill its duties as an SRO under the Exchange Act.  Instead of protecting the integrity of the NASDAQ market, Defendants chose to prioritize its for-profit interests of maximizing trading volume and avoiding corporate embarrassment by pushing forward Facebook's IPO without disclosing to Class Members NASDAQ's known technical problems prior to and during the Offering's May 18, 2012 debut.  These for-profit actions are completely unrelated, separate and apart from any duties or functions of NASDAQ as an SRO under the Exchange Act.

15

## V.   FACTUAL BACKGROUND

43.    NASDAQ is an American stock exchange.  The NASDAQ electronic trading platform provides for the routing and execution of trade orders for its listed securities.

44.    Defendants NASDAQ LLC and NASDAQ OMX operate the NASDAQ stock exchange.  Defendant NASDAQ OMX's website states that the company's trading model is the "standard for markets worldwide," accounting for "1 in 10 of the world's securities transactions."  Defendant NASDAQ OMX's website also stated "[o]ur commitment to excellence goes beyond our 99.999% uptime record for mission critical operations.  It includes our passion for flawless execution and our relentless pursuit to anticipate customer requirements."  As detailed herein, Defendants acted recklessly by failing to update and/or correct statements concerning the reliability and capability of its technology and electronic trading platform which were proven to be materially false and misleading in connection with Facebook's IPO.

### A.   NASDAQ Undertakes An Aggressive Campaign To Solicit Facebook To List Its Common Stock On The NASDAQ Stock Market

45.    On February 1, 2012, after months of media and investor speculation as to when Facebook would seek to go public, Facebook filed its Form S-1 Registration Statement with the SEC in connection with its anticipated public Offering.  Facebook's February 1, 2012 Registration Statement stated the company's goal to raise $5 billion through the Offering.

46.    By the time that Facebook filed its February 1, 2012 Registration Statement, NASDAQ and its chief competitor, the NYSE, had both engaged in aggressive campaigns to solicit Facebook executives to list the company's securities on their respective exchanges.  As detailed in a January 26, 2012 *New York Post* article titled "NYSE, Nasdaq battle for Facebook listing," "[b]oth the NYSE and Nasdaq have been campaigning aggressively for the listing for

16

the past year and have delivered pitches to Facebook CFO David Ebersman and others in Facebook's inner circle in recent months, extolling the virtues of selecting one exchange platform over another." A January 27, 2012 *Business Insider* article similarly noted that the "NYSE and NASDAQ have both been vying to be the exchange platform that Facebook ultimately lists on . . . [t]he two exchanges have been making pitches to Facebook executives over the last couple of months to obtain the listing."

      47.    On January 27, 2012, *The Wall Street Journal* published an article titled "NYSE, Nasdaq Battle For Big Kahuna Of Stock Listings: Facebook," which highlighted the bitter rivalry between NASDAQ and the NYSE over listings of publicly traded companies. Specifically, *The Wall Street Journal* article stated the following:

> Both U.S. stock exchanges have been at war with each other over listings for as long as anyone can remember. The intensity picked up quite in 2011 amid the wave of Internet listings, such as LinkedIn and Groupon.
>
>              *        *        *
>
> Both stock exchanges have battled for years to bring in, or poach, listings by offering promotions and other incentives. Groupon was an especially big win for Nasdaq. Here's what colleagues Brendan Conway and Jacob Bunge reported back in October:
>
>> Perhaps the courtship of Groupon best illustrates the exchanges' tug of war: The competition for the listing, initiated last spring, drew the chief executives of both exchange groups to the daily deals website's home base of Chicago. NYSE's Duncan Niederauer and Nasdaq OMX's Bob Greifeld both personally pitched their markets in June, according to people familiar with the matter.
>>
>> The exchange operators outlined a slew of promotions and co-branding opportunities with other companies listed on their markets. Nasdaq secured victory by agreeing to raise visibility of Groupon's discount offers across a range of media, including the 72-foot billboard on its MarketSite in New York's Times Square, according to people familiar with the matter.

17

*If both exchanges went to those lengths to court Groupon, one can only imagine what they've done to woo Facebook.*

48.     Although the specific communications and substance of the meetings NASDAQ had with Facebook have not yet been publicly disclosed, it is apparent that NASDAQ was doing all that it could to ultimately land Facebook's stock listing, including touting its technological capabilities and electronic trading platform.  On February 2, 2012, the day after Facebook filed its initial Registration Statement, the *Dow Jones Newswire* noted that NASDAQ's CEO, Greifeld, was still in talks with Facebook over its expected IPO.  Greifeld stated that "[w]e obviously are soliciting interest from Facebook and we look forward to having the opportunity to present our complete package."

49.     The winner of the battle between NASDAQ and the NYSE over which exchange would host Facebook's stock listing was finally revealed on April 5, 2012, when *The New York Times* reported that Facebook had chosen NASDAQ.  The article stated, in relevant part:

> The social network will list its shares under the ticker symbol FB on Nasdaq, according to people with knowledge of the matter, who requested anonymity because the discussions were private.
>
> It is a significant coup for the exchange, which has been embroiled in a battle with the New York Stock Exchange for the darlings of Silicon Valley.  While big technology companies, like Apple and Google, have traditionally flocked to Nasdaq, the New York Exchange has aggressively courted the new crop of Internet companies over the last year, grabbing notable offerings like LinkedIn and Pandora Media.
>
> "It's a high-profile win for their listings business," said Michael Adams, an analyst Sandler O'Neill.
>
> *             *             *
>
> For Nasdaq, Facebook is not just any listing.
>
> With more than 800 million users and $3.7 billion in revenue, Facebook has come to dominate the social media industry.  The company is widely expected to go public next month and is on track to be the largest offering since Google's debut

18

in 2004. The I.P.O. could value the sprawling social network as high as $100 billion, people familiar with the matter have said, putting it on par with some of the world's largest corporations, like McDonald's and Citigroup.

**Based on a possible offering of $5 billion or more, the Facebook listing will be the largest in Nasdaq's history, according to data from S.& P. Capital IQ.**

In picking Nasdaq, Facebook had to weigh the differences between the exchanges. Nasdaq is a fully electronic marketplace, while the New York Exchange offers a hybrid model, with a floor-based marketplace and an electronic one. The exchange is widely considered a more global brand, compared with Nasdaq. But its pricing structure is more expensive than Nasdaq's.

Several years ago, Nasdaq was the undisputed leader for technology I.P.O.'s. But its lead has since eroded, amid increasing competition from the exchange, which has spent considerable energy courting the new class of high-flying Internet companies.

50.    On that same day, *Bloomberg* also emphasized how important NASDAQ's win was for its current and future business prospects in securing more lucrative IPO listings – especially in the technology sector:

Exchange operators NYSE Euronext and Nasdaq OMX (NDAQ) Group Inc., rivals for virtually every IPO in America, competed for what may be the biggest listing by a technology company. **Winning the IPO means more fees, a boost in trading revenue and the chance to link an exchange's brand with the largest social-networking website in the world.**

**"There's cachet to winning one of the biggest IPOs ever,"** Tim Hoyle, the director of research at Radnor, Pennsylvania- based Haverford Trust Co., which manages $6 billion including NYSE Euronext (NYX) shares, said in a phone interview. **"The straight- up value of this IPO will make for a nice gain in listing fees, which make up a meaningful portion of the revenue stream for exchanges."**

\*        \*        \*

Nasdaq OMX had more at stake because of the perception it gets all the technology companies, according to Sang Lee, managing partner at Boston-based Aite Group LLC. Among Internet IPOs since the start of 2011, LinkedIn Corp. and Pandora Media Inc. picked NYSE, while Nasdaq won Groupon Inc. and Zynga Inc.

EC.49438.1

"Having that brand name on that listings side would be huge," Lee said of Facebook's selection. "If they're able to do it correctly, the other social-media sites and players would certainly be talking to Nasdaq initially," he said. "It would certainly put them in a very nice position."

51.     Similarly, an April 6, 2012 *Bloomberg* article explained the critical business impact that Facebook will have on NASDAQ's commercial prospects going forward:

People are asking about what it means for NYSE to lose it, but it was critical for Nasdaq to win," Richard Repetto, an analyst at Sandler O'Neill & Partners LP in New York, said in a phone interview. "What it does is it keeps the momentum and likely leads to further IPOs in the future. Whatever brand Facebook attracts, whether it's tech or social media, it likely helps Nasdaq's cause."

*        *        *

While listings bring in less than a quarter of net revenue and even less of profit for NYSE Euronext and Nasdaq OMX, the exchanges fight for IPOs because it leads to more trading and brand value, said Larry Tabb, founder of financial-market research and advisory firm Tabb Group LLC. Listings accounted for 17 percent of NYSE Euronext's net revenue last year and 19 percent of Nasdaq OMX's.

Tabb said March 27 that Facebook's trading may translate into about $500,000 to $1 million revenue per year, split among the exchanges and other venues. That means that NYSE Euronext and Nasdaq OMX could get an additional $260,000 in trading and market data revenue alone.

52.     Based upon these numerous news reports, NASDAQ, its CEO, and others aggressively pursued Facebook to further NASDAQ's own business interests and to cement the exchange as the "go to" venue for the biggest U.S. technology companies.  In doing so, NASDAQ touted its trading model as being the "standard for markets worldwide" and "the fastest trading platform in the world," in connection with pitching its technological capabilities for what would be the largest IPO in the history of NASDAQ.  As detailed below, NASDAQ also chose to make numerous statements in its 2011 Form 10-K concerning its superior technology and how it provided the fastest, most reliable electronic exchange on the market.

20

**B.**     **NASDAQ's Material Statements Concerning Its Technology And Electronic Trading Platforms In Its 2011 Form 10-K**

53.     On February 24, 2012, NASDAQ filed its 2011 Form 10-K with the SEC where it reported, among other things, that NASDAQ had net income of $387 million, or $2.15 per diluted share for its full fiscal 2011, and total net revenues were $1.69 billion for 2011. At the time that NASDAQ issued its 2011 Form 10-K, NASDAQ was engaged in an intense competitive battle to lure Facebook to list its securities with its exchange instead of the NYSE. The 2011 Form 10-K provided detailed statements concerning the purported reliability and speed of NASDAQ's technology and abilities to execute trades in an efficient manner.

54.     In its 2011 Form 10-K, NASDAQ touted the speed and reliability of its technology and trading platforms. Critically, NASDAQ also stated that its trading platforms are "highly scalable," capable of handling large trading volumes at more than "ten times the average daily volume." Specifically, NASDAQ stated:

> Our Genium INET technology platforms, based on proven INET technology that we originally acquired in the acquisition of INET ECN in 2005, *provides technology to customers with the speed, scale and reliability required to meet the specific needs of their markets.*

> \*          \*          \*

> *Leader in global exchange technology.* We believe we are the leader in global exchange technology. As the world's first electronic stock market, we pioneered electronic trading and have continued to innovate over the last 40 years. *Our INET platform processes trades at sub-millisecond transaction speeds with close to 100% system reliability. In addition, our platforms are highly scalable with current capacity at ten times the average daily volume allowing significantly higher transaction volume to be handled at low incremental cost.* . . . We believe that we will continue to provide leading technology for the world's competitive and demanding capital markets, which increasingly require that exchanges be able to constantly secure the best price for investors and issuers, a natural strength of our technology and electronic trading platforms. (emphasis in original).

21

55.     NASDAQ further highlighted the purported strengths of its technology and stated that NASDAQ continues to "provide leading technology for the world's competitive and demanding capital markets, which increasingly require that exchanges be able to constantly secure the best price for investors and issuers, a natural strength of our technology and electronic trading platforms."

56.     NASDAQ also stated in its 2011 Form 10-K its purported commitment to instilling a fair and orderly trading market for investors, including Class Members. Specifically, NASDAQ boasted about its "[c]ommitment to regulatory integrity" and stated that it is "always committed to working with regulators, exchanges and market participants *to ensure transparent trading and a fair and orderly market for the benefit of investors*."

57.     NASDAQ's most profitable business segment for its fiscal 2011 was its Market Services segment. For 2011, 67.4% of NASDAQ's total revenues were from its Market Services segment. This segment offers "trading on multiple exchanges and facilities across several asset classes, including cash equities, derivatives, debt, commodities, structured products and ETFs."

58.     In boasting about the success of its Market Services segment business in the United States, NASDAQ stated "[o]ur transaction-based platforms in the U.S. provide market participants with the ability to access, process, display and integrate orders and quotes for cash equity securities, derivatives and ETFs. The platforms allow the routing and execution of buy and sell orders as well as the reporting of transactions for cash equity securities, derivatives and ETFs, providing fee-based revenues."

59.     NASDAQ stated that the soundness and reliability of its technology were key aspects to its business success. Specifically, NASDAQ made the following statements:

> *Core Technology.* Technology plays a key role in ensuring the growth and reliability of financial markets. *At NASDAQ OMX, we are committed to*

22

*innovation through technology to ensure our position as a driving force in the exchange industry and to provide the best possible trading experience for our customers and investors.* Investment decisions are made based on customer needs and general market trends.

*We continuously improve our core technology with a focus on reducing latency and improving capacity and reliability. NASDAQ OMX's next generation technology is capable of handling multi-million messages per second at an average speed of sub-100 microseconds, currently one of the fastest of any exchange or alternative trading system in the world.*

The foundation for NASDAQ OMX's core technology is INET. The INET technology is used across NASDAQ OMX's U.S. and European markets. INET is also the main building block of our Market Technology offering, Genium INET. Genium INET combines innovative functionality with a modular approach to manage change and create new advantages for existing and new customers, as well as our own marketplaces.

60.     Finally, in its 2011 Form 10-K, NASDAQ provides the investing public, including Class Members, with its "2012 Outlook" which stated that the success NASDAQ experienced in 2011 would continue in 2012. With respect to NASDAQ's technology and trading platforms, NASDAQ stated:

For the fourth year in a row, more share value traded on The NASDAQ Stock Market than on any other single cash equities exchange in the world. *Our platform continues to stand out as a reliable, flexible, and high capacity system delivering high levels of execution quality and speed under even extremely demanding market conditions.* . . . The standout performance and flexibility of our technology has enabled us to enter new markets with a low cost and highly regarded platform offering strong performance to both existing and new clients and creating additional sales opportunities for both our Transactions Services and Market Data businesses.

61.     NASDAQ made material statements to the public, including Class Members, concerning the capability and reliability of its technology and trading platforms. NASDAQ made these statements at the same time that it and its executives were campaigning for Facebook's business. As detailed further below, because NASDAQ chose to make these statements, it had a duty to update and/or correct these statements once it became apparent that

EC.49438.1

these statements were no longer accurate, complete or true. Despite this duty, NASDAQ acted recklessly by failing to update or correct these statements before or during the Class Period, and its material omissions caused Plaintiffs and other Class Members to suffer substantial damages.

### C. NASDAQ Drastically Shortens The Time Period For Facebook To List Its Common Stock On The NASDAQ-100 Index

62.    One day after news reports revealed that NASDAQ won the prized Facebook business against the NYSE, *Bloomberg* reported that one of the main reasons why Facebook chose NASDAQ was because the company had made the business decision to drastically shorten the necessary time that a company needed to be listed on the NASDAQ prior to qualifying for inclusion on the coveted NASDAQ-100 Index. According to NASDAQ's website, the NASDAQ-100 Index "includes 100 of the largest domestic and international non-financial securities listed on The Nasdaq Stock Market based on market capitalization. The Index reflects companies across major industry groups including computer hardware and software, telecommunications, retail/wholesale trade and biotechnology."

63.    An April 6, 2012 *Bloomberg* article highlighted the value for Facebook's securities to be listed in the NASDAQ-100 Index:

> Inclusion in the Nasdaq-100 Index may have spurred Facebook toward Nasdaq, Josef Schuster, founder of Chicago-based Ipox Schuster LLC, which has about $2 billion tied to indexes that track IPOs, said in a phone interview. The benchmark gauge comprises nonfinancial companies including Apple and Google.
>
> *The Nasdaq-100 has surged 165 percent since equity markets bottomed in March 2009, beating the 107 percent gain by the Standard & Poor's 500 Index.*
>
> *Should Facebook get a weighting of 4 percent to 5 percent in the Nasdaq-100, the PowerShares QQQ Trust exchange-traded fund that tracks the measure "could create $2 billion to $3 billion of systematic demand" for the stock,* Schuster said. The ETF has a market value of $35.9 billion, according to data compiled by Bloomberg. Other securities tracking the index would need to make similar purchases.

24

**'Supportive' of Price**

"It would be very supportive for the stock price and may be one of the main reasons Facebook chose Nasdaq," Schuster said. "They'd be with Microsoft, Yahoo and Apple. *Being included would create demand no matter how expensive or cheap the stock is.*"

64.     On April 14, 2012 – only 9 days after Facebook chose to list its stock on the NASDAQ stock exchange – defendant NASDAQ OMX issued a press release announcing the change to its longstanding "seasoning" period for companies to be listed in the NASDAQ-100 Index:

> In addition, NASDAQ OMX is changing and applying consistently the "seasoning" period for NASDAQ-100 Index® (NDX), NASDAQ Financial-100 Index® (IXF) and NASDAQ Biotechnology Index® (NBI) eligibility. *Currently, the NDX and IXF seasoning criteria require a security to be listed on a recognized market for at least two years* (NBI requires six months). . . .
>
> *            *            *
>
> *With the new methodology, a security must have seasoned on NASDAQ, NYSE or NYSE Amex for at least three full months* (excluding the first month of initial listing) based on current month-end data. *The index eligibility changes will be implemented on Monday, April 23, 2012.*

65.     There is little doubt that NASDAQ purposefully relaxed its standards to persuade Facebook to choose its exchange for the Offering. On April 26, 2012, a *Bloomberg* article titled "Facebook Index Early Entry Said Talking Point With Nasdaq" stated:

> Nasdaq OMX Group Inc. (NDAQ)'s waiting period for entry into one of its best-known stock indexes was a negotiating point with Facebook Inc. (FB) as the company weighed where to list its shares, according to a person with direct knowledge of the matter.
>
> The second-biggest U.S. stock exchange operator said on April 13 that it was shortening the so-called seasoning period before new companies are admitted to the Nasdaq-100 Index to three months from at least one year. Facebook confirmed this week it is listing on Nasdaq Stock Market. The social-networking website based in Menlo Park, California, filed to raise $5 billion in February.

25

*Gaining entry to gauges tracked by investors is attractive to public companies because it provides a guaranteed shareholder base.* Exchange-traded funds and other products linked to the Nasdaq-100 managed about $49.4 billion at the end of last year, according to data compiled by Nasdaq.

"The more liquidity support that the stock has, the better, in their view," Perry Piazza, director of investment strategy at Contango Capital Advisors in San Francisco, who helps oversee about $3.3 billion, said in a telephone interview. *Going into the Nasdaq-100 "would help the trading volume of Facebook dramatically,"* he said.

66.     The April 26, 2012 *Bloomberg* article also reiterated why being in the NASDAQ-100 Index was likely a deciding factor for Facebook in choosing to list its stock with NASDAQ instead of the NYSE, quoting a market participant who stated that if Facebook was included in the Index, its common stock would have "to be bought, whether its high or low, cheap or expensive, so it's strategically important."

67.     Given its fierce competition with the NYSE and real risk of losing the most coveted IPO in years, NASDAQ made a for-profit business decision to modify its qualification requirements, thereby making it substantially easier for Facebook to be included in the NASDAQ-100 Index.

### D.     NASDAQ Changes Its IPO Procedures To Maximize Trading Volume In Connection With Facebook's Offering

68.     In anticipation of the largest IPO in NASDAQ's history, the exchange also sought to maximize its profits on its huge Facebook payday by changing its longstanding IPO procedures. Specifically, NASDAQ allowed orders for IPO securities to be placed from 7:00 a.m. EST on the first day of trading. In the past, NASDAQ was only able to capture orders in a 15-minute pre-opening "bookbuilding" phase.

69.     By making this change, NASDAQ was able to significantly increase its revenues on Facebook's Offering and enhance its commercial profile as the venue of choice for companies seeking to go public in the IPO process. However, this business decision was ultimately one of

26

the factors that led to significant disruptions in Facebook's IPO trading during the Class Period,

as NASDAQ's computer systems proved to be incapable of processing the enormous trading

volume that resulted in part from the longer pre-market order window.  As detailed in a June 16,

2012 *Economic Times* article:

> ***Nasdaq was still testing for the consequences of a significant change to its IPO
> procedures the evening before Facebook's troubled debut.***
>
> The change, which made compelling commercial sense for Nasdaq and was
> introduced just weeks ahead of Facebook's May 18 IPO, allowed the exchange to
> capture orders for IPO securities from 07:00 EST on the first day of trading.  The
> previous system only allowed Nasdaq to capture orders in a 15-minute pre-
> opening bookbuilding phase.
>
> Approval for the change had to be given by the US Securities and Exchange
> Commission.  In its March submission asking for approval, Nasdaq said the
> change would result "in a greater number of orders being entered prior to the
> commencement of trading a higher level of order interaction at the open" and
> increase Nasdaq's "attractiveness as a venue for trading IPO securities."
>
> ***The higher the number of orders (and cancellations or changes to those
> orders), the more income is generated for Nasdaq.  The change was introduced
> on April 20.  The fact that the extra time allowed the exchange to gather a
> greater number of orders which were then fed into the 15-minute bookbuild is
> significant because Nasdaq acknowledges that the volume of trades taking place
> during that period exposed a software glitch that caused IPO trading to descend
> into chaos.***
>
> ***The exchange was still testing for the consequences of this change on the eve of
> the Facebook IPO, inviting its members to participate in trade simulations on
> May 16 and 17 run specifically to "support the system's recent enhancement."***
>
> *          *          *
>
> The exchange struggled to open Facebook from 11:05 EST until a decision was
> taken at 11:30 to switch to a secondary matching engine . . . . Orders entered by
> traders during this time or modifications to orders entered prior to 11:05 were
> excluded from the opening trade.
>
> ***The resulting backlog in trade confirmations was not cleared until [1:50 p.m.]
> by which time the losses to member firms had moved towards hundreds of
> millions of dollars.***

27

70.     While NASDAQ allegedly conducted tests of its systems prior to the Facebook IPO, these tests were grossly inadequate given the anticipated volume of trades in Facebook's stock – especially in light of the overwhelming number of orders that were going to be placed for Facebook stock prior to the official opening of trading.  As *The Wall Street Journal* reported on May 12, 2012, Facebook's IPO was "***expected to be the biggest ever to hit Wall Street***."  Market participants widely believed that the trading volume in Facebook's IPO would be record-setting, with estimates that "***day-one trading in Facebook shares could see any many as 600 million of its shares change hands***."

71.     Given the enormous trading volume in Facebook's IPO that was expected to shatter all previous records, NASDAQ provided wholly inadequate stress testing of its system prior to the Offering.  On June 11, 2012, *The Wall Street Journal* reported that NASDAQ conducted a series of tests prior to Facebook's May 18, 2012 IPO which simulated opening trading at volumes of between 6 to 53 million shares.  However, as noted above, trading in Facebook's IPO was expected to – and did – vastly exceed the number of shares NASDAQ simulated in its tests.  According to a May 18, 2012 *CNN* report, "[m]ore than 80 million shares changed hands in the first 30 seconds of trading.  By the end of the day, volume had spiked to around 567 million shares.  That easily set a new volume record for IPOs, smashing the previous record that automaker General Motors set in 2010 with trading of around 450 million shares."

72.     Not only did NASDAQ fail to conduct reasonable trading volume tests on its systems prior to Facebook's IPO, but it also failed to account for the thousands of pre-market purchase orders placed before trading commenced on May 18, 2012.  As detailed below, NASDAQ's electronic systems did not have the capability to properly process the volume of purchase and cancellation orders submitted to the exchange.  Despite Defendants' knowledge

28

that the trading systems were susceptible to failure, NASDAQ continued to make material statements about its technological capabilities and trading platforms and pushed forward Facebook's IPO so that it could line its own coffers with the sizeable fees generated by Facebook's Offering and avoid the embarrassment of delaying the most highly anticipated IPO in NASDAQ's history.

**E.    NASDAQ's Material Statements Concerning Its Technology And Electronic Trading Platforms In Documents Related To Its First Quarter 2012 Financial Results**

73.    In the weeks leading up to Facebook's IPO, NASDAQ continued to issue a series of material statements in documents relating to its First Quarter 2012 financial results that again touted its technology and trading platform capabilities.  These statements were made after the public learned that Facebook chose NASDAQ as the exchange to list its securities and to launch its IPO.  These statements were also made at a time when NASDAQ knew that it had not fixed the technical glitches in its systems and had inadequately tested its trading platforms to ensure that it could properly handle the capacity of trading volume in Facebook's IPO.

74.    On April 25, 2012, NASDAQ filed a Form 8-K attaching a press release which announced its first quarter 2012 financial results (the "April 25, 2012 Press Release").  The April 25, 2012 Press Release reported first quarter net exchange revenues of $411 million, up 1% on a constant currency basis compared to the prior year quarter, and diluted EPS of $0.48.  NASDAQ also disclosed that it was declaring an initial quarterly dividend of $0.13 per share.  Greifeld commented that NASDAQ's first quarter of fiscal 2012 was "our fourth best quarterly result ever."

75.    The April 25, 2012 Press Release also contained statements that touted NASDAQ's technological capability.  Specifically, the April 25, 2012 Press stated that NASDAQ's technology and trading platforms were able to "process more than 1 million

messages per second at sub-40 microsecond speeds with 99.999% uptime, our technology drives
more than 70 marketplaces in 50 developed and emerging countries into the future, powering 1
in 10 of the world's securities transactions."

76.    That same day, NASDAQ held an earnings conference call (the "April 25, 2012
Earnings Conference Call") to discuss its first quarter 2012 financial results with certain
financial analysts.  During the call, NASDAQ's CEO, Greifeld, stated that the exchange was
"delighted to welcome Facebook to our family of listed companies" and noted that "over 73% of
U.S.-listed technology companies have chosen to list with NASDAQ."  During the Q&A session,
an analyst asked Greifeld whether the recent technical problems at BATS Global Markets, Inc.
was unique to that exchange or "is that something that could potentially happen to NASDAQ?"
In response, Greifeld stated, in relevant part:

> We are technology-based businesses, we have to engineer our technologies as best
> as we can, but certainly, we're sympathetic to what BATS when through.  We
> recognize that the business is hard and we certainly have excelled at it.  We have
> a wonderful team and certainly, our experience over the last nine years shows you
> how good that team is. ***But we're not over confident, we recognize that – we've
> got [to] engineer and be very capital about how you release product in the
> marketplace.***

77.    As is now known, the above-referenced statements in the April 25, 2012 Earnings
Conference Call were completely at odds with statements made by NASDAQ's CEO only two
months later.  As admitted by Greifeld on June 25, 2012, "***arrogance***" and "***overconfidence***"
among NASDAQ and its personnel led to NASDAQ being unprepared for the enormous trading
volume in Facebook's Offering.

78.    On May 8, 2012 – ten days prior to Facebook's IPO – NASDAQ filed its Form
10-Q with the SEC (the "First Quarter 2012 Form 10-Q").  Among other things, the First Quarter
2012 Form 10-Q stated that certain factors contributed to NASDAQ's financial performance for

EC.49438.1

the first quarter 2012, including its investment in its technology.  Specifically, the First Quarter

2012 Form 10-Q stated that certain market trends required the "continued investment in

technology to meet customers' demands for speed, capacity, and reliability as markets adapt to a

global financial industry, as increasing numbers of new companies are created, and as emerging

countries show ongoing interest in developing their financial markets."

      79.    NASDAQ chose to make material statements to the public, including Class

Members, concerning the capability and reliability of its technology and trading platforms.

NASDAQ made the above-referenced statements at the same time that it and its executives:  (i)

knew or recklessly disregarded that the trading volume tests on its systems (which only tested a

fraction of the volume that would end up trading during the Class Period) were grossly

inadequate given the anticipated record-setting volume in Facebook's Offering; and (ii)

NASDAQ's electronic systems were experiencing unresolved technical problems and related

computer issues.  As detailed further below, because NASDAQ chose to make these statements,

it had a duty to update and/or correct these statements when it was apparent that these statements

were no longer accurate, complete or true.  Despite this duty, NASDAQ acted recklessly by

failing to update or correct these statements before or during the Class Period, and its material

omissions caused Plaintiffs and other Class Members to suffer substantial damages.

    **F.**     **NASDAQ's Material Statements Concerning Its Technology And Electronic**
           **Trading Platforms On Its Website**

      80.    As demonstrated above, during the approximately three months prior to the Class

Period, NASDAQ did not hesitate to tout its purported cutting-edge technology and trading

platform capabilities that were supposed to reliably function at microsecond speeds in executing

trades and related information.  NASDAQ also made similar material statements on its website,

which were published to the market on a daily basis.  For example, Defendant NASDAQ OMX's

EC.49438.1

website states that the company's trading model is the "standard for markets worldwide," accounting for "1 in 10 of the world's securities transactions."  Defendant NASDAQ OMX's website also touts "[o]ur commitment to excellence goes beyond our 99.999% uptime record for mission critical operations.  It includes our passion for flawless execution and our relentless pursuit to anticipate customer requirements."

81.     In detailing its technology market solutions, Defendant NASDAQ OMX's website states the following:

> NASDAQ OMX comprehensive trading solutions support everything from traditional equities and fixed income instruments to more complex derivatives in one integrated system, and can simultaneously handle several asset classes, such as currencies, different fixed income instruments and commodities.
>
> Our pre-trade risk management service offers marketplaces proven, integrated risk control.  Existing Genium INET trading and X-stream customers can add the pre-trade risk management function without changing protocols for market access.
>
> We pioneered the world's first integrated derivatives trading and clearing system and ***continue to set new standards in exchange trading technology***. Examples of features include:
>
> - Sub-40 microsecond latency
> - Capacity greater than one million quotes per second
> - Seamless integration to clearing
> - Multi-asset class trading on a single platform
> - Robust functionality
>
> ***Our proven delivery methodology ensures delivery on-time, on-target and ready-to-launch.***

82.     NASDAQ chose to make material statements to the public, including Class Members, concerning the capability and reliability of its technology and trading platforms. NASDAQ made the above-referenced statements at the same time that it and its executives:  (i) were campaigning for Facebook's business; (ii) knew or recklessly disregarded that the trading volume tests on its systems (which only tested a fraction of the volume that would end up trading

32

during the Class Period) were grossly inadequate given the anticipated record-setting volume in
Facebook's Offering; and (iii) NASDAQ's electronic systems were experiencing unresolved
technical problems and related computer issues. As detailed further below, because NASDAQ
chose to make these statements, it had a duty to update and/or correct these statements once it
became apparent that these statements were no longer accurate, complete or true. Despite this
duty, NASDAQ acted recklessly by failing to update or correct these statements before and
during the Class Period, and its material omissions caused Plaintiffs and other Class Members to
suffer substantial damages.

      **G.**     **NASDAQ's Materially False And Misleading Statements Concerning Its Technology And Electronic Trading Platforms During Its May 10, 2012 Investor Day Conference**

83.     On May 10, 2012 – *one week prior to Facebook's IPO* – NASDAQ held an
Investor Day conference where it made a series of materially false and misleading statements and
omissions of material fact concerning the purported superiority and capability of its technology
and trading platforms. As detailed below, these statements were made at a time when NASDAQ
knew and/or recklessly disregarded that its systems had significant technical problems that
would, and did, severely disrupt proper trade execution in Facebook's IPO. Indeed, news reports
issued after Facebook's botched IPO detailed NASDAQ's knowledge of the technical problems
it was experiencing in the days leading up to the Offering.

84.     For example, *The New York Post* reported on May 25, 2012 that:

> ***Nasdaq Chief Executive Greifeld pressed ahead with Facebook's initial public offering despite signs that the new software Nasdaq was using to launch the much-hyped stock sale still had bugs***, market veterans said.

> Wall Street insiders said it appears Nasdaq used untested software to launch the botched IPO and had been walking the platform through its paces in an 'unprecedented' number of simulations in the days leading up to Facebook's May 18 debut.

\*        \*        \*

"It's not unusual to test out a new system, but it's unusual to test it as many times as they did that week," one source told the Post.

\*        \*        \*

*[S]ources said that there may have been signs that the system wasn't glitch-free even at the 11th hour and that Nasdaq opted to roll the dice.*

85.    Despite the known problems with NASDAQ's technology and trading platforms, NASDAQ made the following material misstatements, among others, at the Investor Day conference, only days before Facebook's IPO:

- Our business success is built from ***our technology excellence***;

- No trading platform on the planet is ***faster or more scalable***;

- Our technology can help ***trade and clear any and every financial instrument on the planet***;

- We have ***unique capabilities unmatched by any exchange in the world***;

- Our global platform can handle ***more than 1M messages/second at sub-40 microsecond speeds***;

- ***99.999% uptime record*** for mission critical operations;

- [NASDAQ] delivers innovative products and services that ***provide transparency to institutional, retail and individual investors***; and

- Intense operational focus on ***efficiency and competitiveness***.

86.    These statements, and others, were graphically presented on PowerPoint slides that NASDAQ publicly filed with the SEC which were disseminated in connection with its Investor Day conference.  A selection of these slides is attached hereto as Exhibit A.

87.    Similarly, NASDAQ's Chief Information Officer at NASDAQ OMX, Anna M. Ewing, stated the following to investors at NASDAQ's Investor Day Conference:

We really believe that technology is the beating heart at NASDAQ OMX . . . *that our business success is really built from our technology excellence*. . . . And if you think of our trading platform, and *we're well known for our technology, no trading platform in the world can operate faster or at the scale that we operate*. And to put it in perspective, *we can operate – we can process, and we do on peak days, more than 1 million messages per second at speeds of sub-40 microseconds. And to put in perspective, for those of you who can remember what a microsecond is, it's 0.000001 second, just to give you some context.* And you know *our technology can trade and clear really any instrument on the planet.* And in fact, we power one in ten securities transactions around the world through our own markets and through our market technology customers.

We are the world's largest technology exchange provider, with over 22 years of experience, and that is through our market technology business that we acquired through OMX. *We have unique capability that is unmatched by any other exchange in the world. And it's really not just about the technology itself. As Bob said, it's about our ability to execute.* . . .

*          *          *

We process billions of transactions in a day at sub-microsecond speeds to millions of customers. And as much as that's table stakes, *that's hard work just to make sure you have that reliability and capability.* And we're proud of not just our excellence but *how we set the standard around the world as far as that excellence.*

88.   NASDAQ's above-referenced statements were materially false and misleading and omitted material facts because NASDAQ failed to disclose at the time these statements were made that: (i) NASDAQ was experiencing significant problems with its technology and trading platforms that severely limited their capability, speed and reliability to properly execute trades, including the enormous trading volume expected days later in the Facebook's IPO; and (ii) the problems with NASDAQ's technology and trading platforms were not fixed prior to Facebook's IPO, thereby making NASDAQ's systems unreliable and incapable of handling the trading volume in the Offering. NASDAQ failed to communicate these known problems to the market place resulting in a complete lack of transparency to institutional, retail and individual investors concerning their trades in Facebook's IPO.

35

89.     Given these materially false and misleading statements and omissions of material fact, Class Members believed and relied upon the purported capabilities of NASDAQ's technology and trading platforms to execute trades in Facebook's IPO during the Class Period. As detailed below, however, due to NASDAQ's material misstatements and omissions, Class Members executed trades in Facebook's common stock on the day of the Offering without any knowledge of the technical problems NASDAQ was experiencing.

## VI.   CLASS PERIOD EVENTS AND DEFENDANTS' OMISSIONS OF MATERIAL FACT

90.     As detailed herein, prior to the May 18, 2012 IPO, NASDAQ, Griefeld, and others were aware that NASDAQ was experiencing significant technical and computer-related problems with its trading platforms that would cause problems in trade execution in Facebook's IPO.  Despite these known problems, NASDAQ chose to push the Offering forward without disclosing to Class Members the known technical problems that would affect trade executions in Facebook's common stock.  NASDAQ also made materially false and misleading statements and omission of fact, including failing to update and/or correct statements, concerning its purported technological capabilities and trading platform reliability.

91.     As *The Wall Street Journal* reported, hours before the official opening of trading in Facebook's shares was set to begin, NASDAQ was experiencing "queue problems [that] left traders unable to change or cancel premarket orders placed as early as 7:30 a.m." Unfortunately, these premarket technical problems were only the beginning of the long list of computer related malfunctions NASDAQ was going to have that day.

92.     The Facebook IPO was initially set to open at 11:00 a.m. Eastern Standard Time on May 18, 2012 on the NASDAQ stock exchange under the ticker symbol "FB."  The opening was delayed, however, due to malfunctions in NASDAQ's computer systems.  Specifically, at

36

10:58 a.m. NASDAQ issued a notice stating that trading would be delayed until 11:05 a.m. Notwithstanding this notice, Facebook shares did not start trading at this time. Over twenty minutes later, at 11:28 a.m., NASDAQ announced that trading in Facebook shares would begin at 11:30 a.m. Although numerous news outlets reported *after* the May 18, 2012 IPO that this delay was caused by technical problems that prevented NASDAQ from properly processing purchase and cancellation orders, NASDAQ never provided any information *during* the Class Period about these problems.

93.     NASDAQ's technology and trading platform problems were the result of its known malfunctions regarding the software design of its programs for properly processing trade orders, including in NASDAQ's IPO cross capacity. According to *The Wall Street Journal*, Greifeld described the problem with the IPO opening cross as "a design flaw in the systems" that "doomed" the "routine but essential chore of lining up trades."

94.     Under ordinary circumstances, trades submitted by investors are executed and confirmed immediately. Trades placed by investors seeking to purchase Facebook shares on May 18, however, took hours to execute. As a result, Class Members attempting to purchase Facebook shares could not confirm if their trades had, in fact, been executed and, if so, at what price.

95.     These problems were not limited to retail investors; professional traders, brokerage firms, and other institutional investors also experienced the same problems due to NASDAQ's known technical and computer related problems. In short, legions of investors seeking to purchase Facebook stock had no idea if they had successfully done so, and other investors seeking to cancel trades not yet executed had no idea if they had successfully done so. A May 18, 2012 *Wall Street Journal* article further detailed these problems:

37

Professional traders who placed big orders on behalf of hedge funds, mutual
funds, and other institutions waited more than two hours after Facebook shares
started trading at 11:30 a.m. to hear whether the orders would be honored or
canceled. These traders said the uncertainty caused some big investors to bail out
of Facebook stock, because they didn't know for sure what they had bought or
sold, or at what price.

Meanwhile, small-time buyers . . . who placed orders through online brokerages
like Fidelity and Scottrade also fretted for hours whether their trades or
cancellations went through.

96.     In some instances, although Class Members timely placed cancellations of prior

purchase orders, those cancellations were never processed. One such example was recounted in

a May 21, 2012 article in *The Wall Street Journal*:

George Brady, a 66-year-old recruiter in North Carolina, bought 1,000 shares of
Facebook a few minutes after it opened for trading Friday. He said by Monday
morning, he sold his holding, taking a $2,770 loss.

Mr. Brady said he tried not to purchase the shares in the first place, but was
unable to withdraw his order on his Charles Schwab account, calling the situation
"ridiculous." Technical problems on the Nasdaq Stock Market prevented some
investors from confirming their trades or trade cancellations.

97.     Public reports indicated that these problems were the fault of NASDAQ. For

example, a May 21, 2012 *Reuters* article stated:

The Nasdaq Stock Market, where Facebook is listed, had problems sending
electronic messages back to the brokerages that handled orders from individual, or
"retail," investors, according to people with knowledge of the situation.

Because the electronic acknowledgments didn't come back from the exchange the
brokers were unable to tell their clients that trades had been executed. Such
acknowledgments usually occur almost instantaneously. The delay meant that, in
one of the most anticipated stock offerings ever, frustrated brokers and investors
didn't know if orders had actually gone through.

98.     Indeed, NASDAQ has acknowledged it was at fault. Specifically, as *Reuters*

reported on May 21, 2012, "Nasdaq Chief Executive Robert Greifeld said in a conference call

with reporters on Sunday that there had been a malfunction in the trading system's design for processing order cancellations."

99.    On May 25, 2012, *Reuters* published an article providing minute-by-minute detail of Facebook's IPO fiasco.  The article explained the confusion and inability to timely process orders that occurred in the IPO.  The article stated, in relevant part:

> Nasdaq CEO Bob Greifeld pumped his fist at the symbolic opening bell ceremony at Facebook's headquarters in Menlo Park, California next to Facebook CEO Mark Zuckerberg an hour-and-a-half before the company's stock was due to start trading. There were no outward signs then of the problems that were about to unfold back on Wall Street.
>
> At 10:58 a.m., Nasdaq issued a notice that the Facebook opening would be delayed until 11:05 a.m.  IPO delays of that nature are not unusual, especially with a massive launch like Facebook.
>
> But then the revised start time passed without an opening trade on the stock. Minutes passed as traders waited.  Nasdaq's next communication came at 11:13 a.m., when it noted in a terse emailed message to people who subscribe to the exchange's alerts that Nasdaq is "experiencing a delay in delivering the opening print in Facebook," with no other details.
>
> *Meanwhile, market-makers were receiving messages about their orders that later proved to be inaccurate.  They say they were told during the period between 11:05 and 11:30 a.m., when the stock finally opened, that orders were still being taken for the opening price.*
>
> *"Nasdaq representatives were stating right up until 11:29 that they were still accepting orders in Facebook for the open,"* said Turner of Instinet.
>
> But that wasn't the case.  Later, Turner said he was told that orders submitted up to 25 minutes before the opening were either canceled or not submitted into the marketplace until about 1:50 p.m. - more than two hours later.  Other market makers received similar messages.
>
> *Behind the scenes, the massive order volume was overwhelming Nasdaq's systems.*
>
> Orders that were supposed to be processed in 3 milliseconds were taking 5 milliseconds, said one person familiar with exchange operations.  This proved to be a major problem: In the extra two milliseconds new orders flooded in,

thwarting the system's ability to establish an opening price for the stock and leading to a backup in unprocessed orders.

*       *       *

Finally, the decision was made to put through a fix to the systems problem and get the stock trading. That move to a secondary matching engine used the order book as it appeared at 11:11 a.m. - but this meant new orders and changes in orders that came in later did not show up in the opening price. A matching engine is a computer that pairs bids and offers to complete trades.

Eric Noll, Nasdaq's head of transaction services, said in a statement earlier this week that the fix instead led to 2-1/2 hours of uncertainty during which brokers were unable to see the results of their trades.

100.    Although NASDAQ knew it was experiencing significant technical problems causing delays and inaccuracies in processing trades, NASDAQ nevertheless made the decision to push Facebook's IPO forward and failed to disclose to Class Members any information concerning its known problems. This decision, motivated by significant financial and reputational concerns, caused investors to "fly blind" as they had no idea what, if any, Facebook stock they bought and/or cancelled, nor at what prices these transactions took place. The May 25, 2012, *Reuters* article further details these problems:

The stock opened at 11:30:09 a.m. at $42.05 a share. An investor looking at a quote screen might have thought the trouble had ended there. In reality, the problems were about to worsen.

After initially heading to a high of $45, the stock soon began to plunge towards its issue price at $38. Lead underwriter Morgan Stanley stepped in to defend the stock while some others - unsure whether their orders had been processed or not - backed away from trading or decided to sell.

If confidence is undermined at the open, people "pull back because their orders are essentially going into a black hole," said former Nasdaq Vice Chairman David Weild.

Clients were telling their brokers they had not received confirmation of orders - which normally come through in seconds.

40

*"Multiple market makers called Nasdaq and asked them to halt the stock and said, 'You have a problem and it's getting worse,' and their response was, 'The stock is trading normally,'" said an executive at one market-maker.*

*       *       *

For market-makers, the chaos was particularly problematic because they didn't know what they and their clients owned, and at what price.

*"Should I be selling stock, should I be buying? And what's my price point?" said another official at a market-making firm. "You just don't know, so you were in effect flying blind until 2 o'clock."*

101.    Class Members, including the named Plaintiffs herein, had no idea that the quotes for bids and offers listed on NASDAQ's system were completely wrong. If the NASDAQ's system performed properly, Class Members would have submitted their trade orders for Facebook common stock at a specific price and quantity quoted by NASDAQ and then, within seconds, received an order confirmation from NASDAQ confirming what Class Members had purchased and/or sold. Indeed, under normal circumstances, Class Members who traded on the NASDAQ stock exchange would get the National Best Bid/Offer ("NBBO") quote published for Facebook stock. The NBBO represents the best price available on any market at the time that an order is placed, and customers expect to receive the NBBO when they place a buy or sell order in a security. NASDAQ represents to all investors that they will receive the NBBO on their orders.

102.    During the Class Period however, NASDAQ failed to publish the NBBO for Facebook stock, disrupting trade orders and preventing Class Members from receiving accurate information about the market for Facebook shares. In fact, Class Members submitted orders and never received confirmations in a timely manner, if they received confirmations at all. Certain Class Members that did receive late confirmations found out that they purchased and/or sold Facebook common stock at completely different prices than were submitted in their orders.

41

103.    NASDAQ disregard these known problems, including the inaccurate quotes for

bids and offers on its system, and made the decision to put its own commercial interests ahead of

its duty to properly execute trades.  Defendants also failed to disclose any information prior to

and during the Class Period concerning NASDAQ's known technical and computer related

problems that prevented Class Members from knowing their trading positions in Facebook's

common stock.  Similarly, Defendants failed to update and/or correct statements concerning the

capability and reliability of NASDAQ's technology and trading platforms once they knew that

NASDAQ was experiencing severe technical problems with properly executing Facebook trades.

As reported in a June 6, 2012 *New York Times* article, it was only after NASDAQ caused Class

Members to suffer massive losses that NASDAQ's CEO, Greifeld, "admitted that the ordeal left

his company 'humbly embarrassed.'"

## VII.   POST-CLASS PERIOD REVELATIONS

104.    Given NASDAQ's admitted wrongdoing, including making material false and

misleading statements and omissions of material fact concerning the purported reliability and

capability of its trading platforms and technology, on June 11, 2012, *The Wall Street Journal*

reported that Greifeld had pledged more than $40 million "to compensate investors for losses on

the bungled IPO."  The article also stated:

> The technical answers are unlikely to mollify big-time traders and mom-and-pop
> investors who say the troubled IPO weakened their confidence in the 41-year-old
> Nasdaq or even the stock market itself.  Investors and financial firms are claiming
> losses of some $500 million on Facebook shares they say they didn't want,
> couldn't sell when the price began sliding or agreed to take back from angry
> customers.  The figure was driven higher Friday with word that UBS AG US was
> blaming the confusion for up to $350 million of losses.
>
> *          *          *
>
> Mr. Greifeld says a design flaw in the systems used successfully in over 400 IPOs
> somehow doomed the routine but essential chore of lining up trades to set the

42

opening price for Facebook shares. Then a surge of order cancellations jammed the system, causing delays in the start of trading.

Nasdaq says its computers were overwhelmed in part because the IPO process let investors submit orders until Facebook opened, rather than briefly halting the flow during the lineup. "We over-engineered it," Mr. Greifeld says.

*       *       *

Looking back, some longtime traders say chaos was so widespread they are even skeptical about the accuracy of the $42 price where Facebook opened for trading. "Mathematically, it's impossible," Jose Marques, who oversees electronic stock trading at Deutsche Bank AG, told colleagues, according to people familiar with the matter. Sell orders were piled high at Nasdaq but stuck in a logjam, traders there and elsewhere say, propping up Facebook at an artificially high price.

105.    On July 21, 2012, weeks after NASDAQ had admitted its fault for the botched Facebook IPO, *The Wall Street Journal* reported that NASDAQ will increase compensation to investors who lost money due to its misconduct by now setting aside $62 million. The article noted that NASDAQ will use this money, in part, "to contain the reputational damage from the Facebook snafu." The article quoted Greifeld who admitted that "[w]e failed to meet our own high standards. . . . We have learned from this experience and we will continue to improve our trading platforms." The article also noted that NASDAQ "hired International Business Machines Corp. (IBM) to review its trading systems . . . ."

106.    The June 11, 2012 *Wall Street Journal* also noted that the SEC is undertaking an investigation into the technical malfunctions at NASDAQ and seeks to determine when and what people knew about these problems:

The SEC is scrutinizing the glitches as part of an inquiry that includes determining whether financial forecasts and other data Facebook gave to bankers were properly reflected in what bankers told their clients ahead of the $16 billion stock sale, according to people familiar with the matter.

*As for the trading snarls, these people say, SEC officials want to know whether anyone at Nasdaq withheld any information about computer-system problems that might have led officials of the exchange, underwriters or Facebook to*

43

*postpone trading beyond the 30-minute delay.  The agency also is looking into whether Facebook investors were told enough by Nasdaq amid the problems to make informed buy and sell decisions.*

"Every minute of that morning will be dissected" by regulators, said one person close to the SEC's inquiry.  Officials plan to sift through calls and emails among Mr. Greifeld and other Nasdaq executives.

*More broadly, some SEC officials have questioned privately whether the breakdown is tied to the transformation of U.S. exchanges over the past decade into profit-focused publicly traded companies from private, member-owned organizations.*

107.    Similarly, on June 21, 2012, *The New York Times* noted that the SEC is

"*examining whether NASDAQ failed to properly test its trading systems, which broke down*

*during the I.P.O.*, and whether the exchange violated rules when it rewrote computer code to

jump-start trading." *The New York Times* article further states:

Nasdaq's lack of communication — and at times, lack of contrition — aggravated the situation, according to documents and executives, bankers and regulators.  On a May 31 call with the chairwoman of the S.E.C., Mary L. Schapiro, and other officials, Nasdaq's chief executive expressed confusion about the S.E.C.'s aggressive approach.

                   \*       \*       \*

The S.E.C. is examining why Nasdaq lacked an action plan for navigating such a crisis, including plans to abort the I.P.O., and whether it failed to follow federal guidelines in running system tests. . . .

Ultimately, Nasdaq overrode the system manually, switching to a backup server.  That move, too, has drawn scrutiny.  Exchanges must follow their own strict trading procedures.  In this case, Nasdaq changed its procedure on the fly without amending its rules.

108.    The June 21, 2012 *New York Times* article also highlights how NASDAQ's

technical problems caused Facebook's stock to decline in value, wiping out billions of dollars in

market value:

Shares started trading at 11:30 a.m., sending brief applause through Morgan Stanley's trading floor.  The Facebook team, which had been hoping for a 5 to 10

44

percent jump from the offering price of $38, was relieved when it rose.  The team headed to Teterboro Airport to fly back to California.

Then at 1:50 p.m., a second wave of confusion ripped through Wall Street.  Traders saw an unexpected sell order of roughly 11 million shares.  Some wondered whether a big hedge fund had dumped shares.  Investors, on the fence about buying, backed off.  Others sold.  Within minutes, Facebook slipped $2, to roughly $40.

There was no mystery hedge fund seller.  As Nasdaq started processing trades backed up in the system, those shares were dumped on the market, according to people with knowledge of the matter.  About the same time, some Facebook shares that had ended up in an account at Nasdaq were also sold without warning.  The move may have violated Nasdaq's own rules, which do not explicitly allow the exchange to take a position in the shares of an I.P.O., according to one of the people.

109.    Not only are the SEC and the U.S. Senate conducting investigations into NASDAQ's woeful handling of Facebook's IPO, but Facebook itself is blaming NASDAQ for its trading problems, which caused Facebook's stock price to plummet after the Offering.  On June 14, 2012, Facebook filed a motion with the United States Judicial Panel on Multidistrict Litigation, seeking to transfer and consolidate all lawsuits against Facebook, certain underwriters, and NASDAQ to the United States District Court for the Southern District of New York arising out of the Offering.  In its motion papers, Facebook blames NASDAQ for its trading problems, noting that trading was delayed "as a result of problems with Nasdaq's software systems, which impaired the orderly executions of trades and price levels."  Citing several media reports, the motion goes on to say that these disruptions created a chaotic environment that prompted many investors to sell.

110.    On June 25, 2012, *The Wall Street Journal* reported that, given NASDAQ's admitted failure to ensure that its systems could properly process orders in connection with Facebook's IPO, NASDAQ's CEO, Greifeld, finally admitted that "'*arrogance*' and '*overconfidence*' among Nasdaq staffers contributed to problems with Facebook Inc.'s initial

public offering last month. . . . ***Nasdaq was unprepared for increasing numbers of canceled orders in the hours leading up to Facebook's debut.***"  The article further quotes Greifeld who explained that NASDAQ's inadequate testing before Facebook's IPO "***didn't account for the increasing volume at which cancellations can come in.***"  Moreover, Greifeld admitted that "Nasdaq executives relied too heavily on assurances from the exchange's technology group" and that "[t]here was not enough of a check and balance. . . . ***We did not have enough business judgment in the process.***"

111.   Approximately six weeks after NASDAQ botched the Facebook IPO, NASDAQ's reputation remained in turmoil.  As *The New York Times* reported on July 1, 2012:

> For years, the exchange, considered friendly to start-ups, was the preferred place for up-and-coming technology companies.  Now, Nasdaq is trying to salvage its reputation with Facebook and the rest of Silicon Valley while also fending off the advances of its archrival, the New York Stock Exchange, which has ramped up efforts in the industry.

> "***Nasdaq will be wearing that albatross for quite a while,***" said Lise Buyer, founder of Class V Group, an advisory firm for initial public offerings.  "The errors associated with Facebook's I.P.O. will now be part of Nasdaq's conversations."

> *        *        *

> Facebook is upset about Nasdaq's lack of communication, according to people close to the company.  Executives were left out of important decisions like whether the stock should begin trading at all given the crush of early issues.  Once trading did begin on May 18, Nasdaq did not contact Facebook's chief financial officer, David Ebersman, who was the main point person for the I.P.O.

> Executives at the social network have also grown frustrated by the technology problems.  Many order confirmations were delayed.  These were eventually released hours later, along with stock that ended up in a separate Nasdaq account.  But the unexpected flood of shares looked like a giant order of roughly 11 million shares, weighing on the stock, according people with knowledge of the matter.

> Facebook executives believe Nasdaq added to the woes the next week.  Before the second trading day, Nasdaq alerted traders to file claims by noon if they wanted financial "accommodations" for the I.P.O.  Executives believe the notice

46

encouraged investors to dump shares to prove a loss on Facebook, prompting the stock to fall more than $4 in the first hour of trading that day.

Perhaps most disconcerting was Nasdaq's conference call with reporters on Sunday, just days after the I.P.O.  On the call, Mr. Greifeld, Nasdaq's chief, assured the press that Nasdaq's errors had not affected the stock's performance.

"It would lead a reasonable person to conclude that it didn't have an impact on the stock price," he said.

*The statement was tantamount to an act of betrayal, according to those close to Facebook. Once again, the Facebook team was baffled. Why didn't the exchange warn them about Mr. Greifeld's comments? Incensed, a Facebook executive told Mr. Greifeld, "You don't understand the hole you're in."*

112.    As demonstrated herein, it was only after the Class Period ended that Defendants admitted that NASDAQ failed to execute trade orders promptly, accurately, and efficiently and did not maintain an orderly trading market in connection with Facebook's IPO.  While Defendants accepted fault for NASDAQ's technical problems, they failed to disclose this known information to Class Members prior to and during the Class period which caused them, including the named Plaintiffs herein, substantial losses.

## VIII.   CLASS ACTION ALLEGATIONS

113.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) on behalf of themselves and all other persons and entities that purchased and/or sold on the open market the common stock of Facebook on May 18, 2012, the first day of trading in connection with Facebook's IPO, and who suffered monetary losses as a result of Defendants' reckless conduct as detailed herein.  Included in this Class are all individuals, persons and entities that placed buy, sell or cancellation orders with respect to Facebook common stock on the NASDAQ stock exchange on May 18, 2012 whose orders were not promptly, timely, correctly and efficiently processed, and were delayed, or otherwise were adversely affected by the events described herein, and who suffered monetary losses thereby.

47

114.    The members of the Class are so numerous that joinder of all members is impracticable.  According to *CNN*, approximately 567 million shares of Facebook common stock were traded on the day of its IPO.  Some reports indicate that at least 30 million (if not more) Facebook shares were affected by NASDAQ's failure to properly address known technical problems prior to commencing trading in Facebook's stock.  Upon information and belief, there are thousands of Class Members.

115.    Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiffs have retained competent counsel experienced in class action and securities litigation.

116.    Plaintiffs' claims are typical of the claims of the other members of the Class and Plaintiffs do not have any interests antagonistic to, or in conflict with, the Class.

117.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the damages suffered by individual Class Members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class Members to seek redress for NASDAQ's wrongful conduct absent a class action.  Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

118.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

48

(b)     whether statements made by Defendants to the investing public before and during the Class Period misrepresented and/or omitted material facts and whether Defendants had a duty to correct and/or update such statements;

(c)     whether Defendants omitted material facts concerning its technology and trading platforms during the Class Period; and

(d)     whether the Class Members have sustained damages and, if so, the proper measure of such damages.

## IX.     CAUSE OF ACTION

### COUNT I:  Violation Of § 10(b) Of The Exchange Act And Rule 10b-5 Promulgated Thereunder

119.     Plaintiffs incorporate by reference and reallege all preceding paragraphs as fully set forth herein.

120.     This Count is brought by Plaintiffs collectively and on behalf of the proposed Class under Section 10(b) of the Exchange Act and SEC Rule 10b-5 against all Defendants.

121.     During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class Members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase and/or sell Facebook common stock without any knowledge of NASDAQ's technical and computer related problems in executing trade orders.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, collectively and individually, took the actions set forth herein.

122.     During the Class Period, Defendants named in this Count:  (i) employed devices, schemes, and artifices to defraud; (ii) omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (iii)

49

engaged in acts, practices, and a course of business which operated as a fraud and deceit upon

Class Members in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated

thereunder.

123.    In addition to the duties of full disclosure imposed on Defendants as a result of

Defendants making affirmative statements and reports, or participation in the making of

affirmative statements and reports to the investing public, Defendants had a duty to promptly

disseminate truthful information that would be material to investors in compliance with the

integrated disclosure provisions of the SEC, including accurate and truthful information with

respect to the Company operations, technologies and trading platforms.

124.    Defendants, individually and in concert, directly and indirectly, by the use, means,

or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

continuous course of conduct of making affirmative statements and then failing to disclose

material facts necessary to make those statements, in light of the circumstances under which they

were made, not misleading.

125.    Specifically, Defendants named in this Count made material false and misleading

statements and omissions of material fact and failed to update and/or correct prior statements

concerning NASDAQ's purported reliability, speed, and capability of its technology and trading

platforms in the weeks leading up to Facebook's IPO and during the Class Period when

Defendants knew that its systems would likely be unable to properly facilitate the record-

breaking IPO trading volume in connection with Facebook's Offering.  Defendants also omitted

to state material facts necessary to make statements made not misleading in connection with

NASDAQ's technology and trading platforms during the Class Period in violation of Section

10(b) of the Exchange Act and SEC Rule 10b-5.  In this regard, Defendants knowingly or

recklessly failed to disclose to Plaintiffs and other Class Members that NASDAQ was experiencing significant technical and computer related problems in connection with Facebook's IPO, as alleged more fully above. By relying, directly or indirectly, on the absence of material adverse information omitted by Defendants, Plaintiffs and other Class Members purchased Facebook common stock during the Class Period and were damaged thereby due to NASDAQ's material omissions.

126.    Defendants named in this Count acted with scienter in that they each had actual knowledge of the material misstatements and omissions of material fact set forth herein, and/or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misstatements and omissions were done knowingly and/or recklessly and for the purpose and effect of, among other things, concealing NASDAQ's technical and computer related problems to push forward the largest IPO in the history of the exchange. As demonstrated by the Defendants' material omissions throughout the Class Period, Defendants, if they did not have actual knowledge of the material omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether the statements made omitted material facts.

127.    At the time of said material omissions, Plaintiffs and other Class Members were ignorant of the facts available to Defendants. Had Plaintiffs and other Class Members known the truth concerning NASDAQ's technical and computer related problems, they would have not have placed orders to buy Facebook common stock with NASDAQ.

128.    By reason of the foregoing, and as a direct and proximate result of Defendants' wrongful conduct, Defendants named in this Count violated Section 10(b) of the Exchange Act

EC.49438.1

and SEC Rule 10b-5 and are liable to Plaintiffs and Class Members for damages they suffered in connection with their purchases of Facebook common stock during the Class Period.

## X.     PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others Class Members, pray for relief and judgment as follows:

(a)     Determining that this action is a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, and appointing Plaintiffs as Lead Plaintiffs and their counsel as Lead Counsel pursuant to Rule 23(g) of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class Members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be determined at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including a reasonable allowance of fees for Plaintiff's attorneys and experts; and

(e)     Awarding Plaintiff and the other Class Members such other and further relief as the Court may deem just and proper.

## VIII.    JURY TRIAL DEMANDED

Plaintiff demands a jury trial on all issues so triable.

Dated:  August 3, 2012

Respectfully Submitted,

Andrew J. Entwistle, Esq.
Vincent R. Cappucci, Esq.
Robert N. Cappucci, Esq.
Jordan A. Cortez, Esq.
Marc X. LoPresti, Esq. (Of Counsel)
**ENTWISTLE & CAPPUCCI LLP**
280 Park Avenue, 26th Floor West
New York, NY 10017
Phone:  (212) 894-7200
Facsimile:  (212) 894-7272

*Attorneys for Plaintiffs*

53